Joseph S. **HEITZLER**, Respondent,

v.

Fred A. **EPPENBERGER**, Chairman, Donald W. Paule, Vice Chairman, and Mrs. Eleanor Waltuch, as Members of the Civil Service Commission of St. Louis County, Appellants.

No. 40291.

Missouri Court of Appeals, Eastern District, Division Two.

Feb. 5, 1980.

Motion for Rehearing or Transfer to Supreme Court Denied March 14, 1980.

Thomas W. Wehrle, St. Louis County Counselor, Andrew J. Minardi, Clayton, for appellants.

Robert T. Ebert, Thomas P. Howe, Walsh, Howe & Ebert, Clayton, for respondent.

STEPHAN, Presiding Judge.

Appeal by the members of the Civil Service Commission of St. Louis County from a circuit court decree ordering the reinstatement of county employee Joseph Heitzler. Heitzler had been dismissed from his position as superintendent of the Adult Correctional Institution (ACI) by the appointing authority, William J. Hennessey, Director of the County Department of Welfare. After an adversary hearing, the commission found that the charges made by Hennessey against Heitzler were true and that the dismissal was warranted. Subsequent judicial review brought pursuant to Chapter 536, RSMo 1969, produced a reversal of that ruling and an order of reinstatement with back pay, the circuit court finding the decision to be unsupported by competent and substantial evidence on the record. Because we find such support in the record, we reverse and remand for disposition in accord with the commission's ruling.

Hennessey, as director of the county's Department of Welfare, was responsible for the administration of the four major units which comprised the department. The ACI, popularly known in the St. Louis area as "Gumbo," was one of those units. Heitzler, as superintendent of the ACI, was answerable directly to Hennessey. Hennessey was a member of the cabinet of the county supervisor [1] and served at the supervisor's pleasure. It was his responsibility to establish the policy for the operation of the units of the department. (Or, on occasion, policy

and guidelines were developed by the county administration, primarily the office of the supervisor.) It was the duty of unit superintendents to implement that policy in their respective units.

Heitzler was dismissed on November 1, 1975. By letter dated November 5, 1975, Hennessey cited the authority under which the dismissal was effected [2] and outlined the reasons therefor. Hennessey charged Heitzler with inflexibility and unwillingness to adapt to change, an uncooperative attitude and breach of discipline through consistent resistance to carrying out those of Hennessey's directives with which he disagreed. Hennessey listed six specific incidents or series of incidents in which he felt that the problem had manifested itself. The Civil Service Commission found that the evidence supported Hennessey's charges in all six areas and therefore found there to exist adequate cause for Heitzler's dismissal under Civil Service Rule XVII. The circuit court made contrary findings on all six points.

The scope of our review herein is well established. We are not to substitute our judgment on the merits of the case for that of the commission. We merely determine whether the commission's ruling was supported by competent and substantial evidence and, if so, whether or not it was clearly contrary to the overwhelming weight of the evidence. In doing so, we must view the evidence in the light most favorable to the commission's findings, giving it the benefit of all favorable inferences reasonably drawn therefrom. Assessment of the credibility of witnesses is a matter within the purview of the commission and deference must be given its findings in that regard. *Friedman v. Miller*, 525 S.W.2d

---

1. The official title of the chief executive officer of St. Louis County has been changed to county executive. We will refer to the office as that of supervisor, the title as of the time these proceedings commenced.

2. County Civil Service Commission Rule XVII, § 4 provides that county employees may be dismissed for cause and lists as adequate causes for dismissal, inter alia, the fact that the

employee "has not consistently maintained harmonious relationships with fellow employees or his supervisors"; or that he "has violated any lawful and reasonable official order or failed to obey any lawful and reasonable direction made and given to him by his supervisor when such violation or failure to obey amounts to insubordination or breach of discipline."

770, 772 (Mo.App.1975); *Hanebrink v. Parker*, 506 S.W.2d 455, 457–458 (Mo.App.1974). See also *Morice v. Nations*, 568 S.W.2d 805, 807 (Mo.App.1978). The evidence to exonerate Mr. Heitzler was ample but not overwhelming. If we were empowered to weigh the credibility of the testimony, as apparently the circuit court did, we would find some difficulty in disagreeing with the circuit court's findings and conclusions. But this is not our function in cases such as this, nor was it that of the circuit court. *Ferguson v. Hood*, 541 S.W.2d 19, 21–22[1] (Mo.App.1976). Here the only issue is whether there is substantial and competent evidence to support the findings of the commission. We will discuss the evidence as it relates to the six charges infra.

■ The first charge against Heitzler was his resistance to implementing a change in the weapons policy at the ACI, a change ordered by Hennessey. The modification stemmed from a March 1975 meeting between the recently installed county supervisor and a number of supervisory personnel from the Department of Welfare, including both Hennessey and Heitzler. At the time of the meeting, it was established policy that perimeter guards at the ACI were to be armed with shotguns and were to use the weapons, when other means proved ineffective, to protect human life, to prevent the escape of an inmate and to prevent acts of sabotage or arson directed against county property. During the course of the meeting, the supervisor indicated that he did not want any of the inmates of the ACI shot should they attempt to escape. Heitzler commented that he believed the use of the shotguns at the ACI was necessary but the supervisor disagreed, saying he felt it inappropriate to fire on inmates at a medium security institution, as was the ACI. Hennessey subsequently indicated to Heitzler, orally, on a number of occasions that he wanted the weapons policy at the ACI changed to reflect the supervisor's directive. Heitzler continually resisted, explaining, at various times, that he opposed the change on policy grounds, that he felt the supervisor lacked the legal authority to "disarm" the guards, and that Hennessey

had failed to issue him, Heitzler, a written directive ordering the change. On October 17, 1975, at a staff meeting, Hennessey learned that Heitzler had still failed to implement the new policy. He immediately wrote out and handed to Heitzler a memorandum, in longhand on notebook paper, instructing Heitzler to order his guards not to fire on ACI inmates to prevent escape when such escape posed no threat to the personal safety of others. Heitzler, on the first subsequent working day, October 20, more than seven months after the meeting with the county supervisor, issued a memorandum advising his guards of the change in policy.

The circuit court found the charge unsupported by the evidence adduced at the hearing before the commission because it found that Heitzler was justified in demanding a written instruction to modify the policy; and that the change in policy was illegal under § 221.200, RSMo 1969, and county ordinance, Chapter 708 SLCRO 1974. We do not agree.

The evidence amply supports the finding that Heitzler was fully aware, based on his oral communications with Hennessey, of the nature of the change desired by Hennessey. Heitzler attended the meeting with the county supervisor. He engaged in an ongoing discussion concerning the proposed modification with Hennessey following that meeting and was told that the revision was the result of a policy decision by Hennessey and the county supervisor. Mr. Ralph Larsen, Supervisor of Social Services at the ACI at the time of this incident, testified that Heitzler had told him that he had been instructed in March to implement the new policy but that he did not intend to do so. There is nothing in the evidence to indicate that under department practice oral directives did not carry the same weight as written ones. Hennessey testified that he customarily dealt with his unit superintendents through oral as well as written orders. Mr. Leo Plante, Superintendent of the St. Louis County Jail (another unit of the welfare department), updated the weapons policy at that institution on April 2, 1975,

pursuant to Hennessey's oral directive to do so. We do not believe it significant, as did the circuit court, that the new weapons policy was in derogation of a long-standing written policy which had been promulgated in the form of a department instruction by Hennessey, inasmuch as it was Hennessey himself who ordered the revision and did so in unequivocal terms.

Heitzler relies on § 221.200, RSMo 1969, and common law precedent in support of his contention that Hennessey lacked the legal authority to revise the weapons policy as he desired. Conceding that those authorities enjoined Hennessey to impose suitable restraint on those inmates in his custody, we do not believe that it can be said that they imposed upon him the duty to shoot escaping inmates. The choice of method of executing his statutory and common law duty to guard the ACI inmates was a policy matter for Hennessey, and we cannot agree with the circuit court that his decision to revise the ACI weapons policy was a decision "not to guard prisoners." We therefore believe the findings of the commission in this regard to be amply supported by the evidence.

The second charge against Heitzler concerns the work release program run by the Department of Welfare. In March 1975, the county supervisor indicated that he wanted an increased emphasis placed on the program. The existing work release program was expanded and a dormitory to house the participants was prepared in Clayton. Although there was some divergence of opinion at the hearing concerning the importance of Heitzler's role in the program, it is clear that at the very least he was responsible, in conjunction with a Work Release Board, for filling vacancies in the program as they occurred, i. e., he was to keep the twenty-six man dormitory filled to capacity from the ACI population. On June 25, 1975, Heitzler issued a memorandum to the ACI inmates outlining the program and inviting their participation.

In a July 9 memorandum to Robert Bondurant of the welfare department Hennessey expressed his dissatisfaction at the slow progress that had been made in filling the available positions in the program. In an August 12 memorandum to Heitzler, Hennessey voiced his concern over Heitzler's failure to keep the dormitory filled and directed him to use his best judgment to bring the program to maximum capacity. He requested Heitzler's full cooperation and indicated that the work release program was to be of top priority for Heitzler and the social services staff at ACI. Subsequently, on September 11, Heitzler was relieved of his responsibility in connection with the program, Hennessey feeling that Heitzler had failed to keep the program operating at full strength. Heitzler's duties devolved on Mr. Don Corzine, under whom the dormitory was kept at or near maximum capacity.

The gist of Hennessey's complaint in this regard is that Heitzler failed to give the work release program the top priority treatment which he had requested. It was of paramount concern to Hennessey simply to keep the dormitory filled, in accordance with the county administration's views. Hennessey felt that Heitzler's emphasis on the educational programs at the ACI and his unwillingness to take risks on perhaps marginal applicants to the program prevented his successful execution of this responsibility. The circuit court thought it significant that Heitzler first received written notice that work release was to be of first priority in the August 12 memorandum from Hennessey. We do not agree. Hennessey testified that he had "continual discussions" with Heitzler shortly after the program expanded; and that he indicated to Heitzler that the latter's standards for eligibility for the program were too rigid and that the primary concern was to keep the dormitory filled. It appears from the evidence that Heitzler was sincerely committed to the work release program. However, we believe there was sufficient evidence from which the commission could have found that Heitzler was more selective in screening candidates for the program than Hennessey wanted him to be; that Heitzler was aware of Hennessey's views; but that he failed to comply with them.

The third charge against Heitzler concerned his use of temporary employees.[3] The department maintained a list of "702 employees" (so designated because of the payroll account number under which they were organized) who were available on short notice when a regularly scheduled employee failed to report to work. Most of the 702 employees had prior experience as corrections officers in the department. Although Heitzler himself testified at the hearing that he disagreed with the policy of utilizing 702 employees, we do not believe that competent and substantial evidence was adduced to support Hennessey's contention that Heitzler had "on several occasions" refused to use 702 employees who had been certified as qualified corrections officers by the department and that his reluctance to use the 702 employees resulted in unnecessary overtime pay for ACI employees. There was, however, evidence that in one instance Heitzler had refused to use a certified 702 employee, recommended by Hennessey, because he felt that the individual's prior experience, limited to the county jail, did not qualify him to work at the ACI. Though perhaps such an incident is of little consequence in itself, the commission could accept it as evidence of the alleged pattern of Heitzler's reluctance to follow the policies with which he disagreed. We believe a reading of the commission's findings and conclusions indicates that the commission so regarded the matter.

Hennessey further charged Heitzler with failure to implement the staffing pattern which Hennessey had requested. In a memorandum dated March 11, 1974, Hennessey indicated his dissatisfaction with Heitzler's organization of his staff at the ACI. Essentially, Heitzler had organized his staff into three shifts requiring the use of thirty-two corrections officers to provide the necessary round-the-clock supervision of the inmates. On May 13, 1974, Hennessey issued a memorandum to Heitzler and Leo Plante of the county jail, again indicating

his displeasure with their staffing patterns and outlining a five-shift arrangement which he desired that they use as a model in a staff reorganization. Hennessey's plan would have required the use of only twenty-five staff officers. Heitzler, on May 20, returned a memorandum, informing Hennessey that he did not intend to implement Hennessey's proposal, as his shift supervisors considered it impractical and he, Heitzler, felt that it provided inadequate security at his institution. Heitzler offered to discuss the problem with Hennessey at the latter's convenience. Subsequently, on October 18, 1974, Hennessey again requested Heitzler and Plante to review their current staff organization "in terms of most effective deployment of manpower"; he requested that they divide all corrections officers into four teams of seven officers and outlined the way in which he wanted the teams used; Hennessey closed the memorandum with a request for Plante's and Heitzler's recommendations by October 29. Heitzler responded by memorandum on that date, and indicated that he would retain his current staffing organization "[u]nless directed otherwise" because he felt that Hennessey's proposed plan would cause one shift to work irregular hours and would thus result in employee dissatisfaction and a consequent high turnover rate. In a November 1 memorandum, Heitzler reiterated the grounds for his opposition to the proposal and again indicated that he would continue to use his current staffing pattern. Heitzler at no time attempted to put Hennessey's proposal, or a modification of it, into effect. At the time of Heitzler's discharge, November 1, 1975, Hennessey's proposed plan had not been implemented at the ACI.

█ The circuit court, in finding the commission's ruling on this point unsupported by the evidence, did not indicate its precise reasons for so holding. The apparent grounds for its ruling, however, were that Heitzler was never directly ordered to im-

---

**3.** In this charge, Hennessey also alleged that Heitzler's antagonistic attitude toward a female corrections officer seeking promotion at the ACI had caused her to resign. Because the commission found this element of the charge unsupported by the evidence, the issue is not before this court.

plement a new staffing organization or that Hennessey's proposal was unreasonable. (See the County Civil Service Rule XVII, § 4, supra, footnote 2, in which failure to obey a superior's "reasonable direction" constitutes grounds for an employee's dismissal.) We cannot agree with such reasoning. Hennessey's memorandum of October 18, 1974, may be construed as nothing more than a request to Plante and Hennessey to review their current staffing procedures and to submit recommendations for possible improvements. We believe, however, that the commission could reasonably have found that Hennessey's earlier memorandum of May 13 was a rather forceful indication that he wanted a change effected in the ACI staffing pattern, with which he was dissatisfied; and that, although the memorandum gave Heitzler some latitude in working out the details of the reorganization, *some* modification of the current procedures was to be implemented with the five-shift proposal outlined therein to be used as a guideline. Furthermore, Hennessey testified that he had had a number of oral discussions with Heitzler in which he had indicated to Heitzler that he wanted the ACI staffing restructured. As to the "reasonableness" of Hennessey's proposed reorganization, the record indicates that the proposal was not a novel concept but was, rather, a "well-recognized method of staffing institutions" such as the ACI and was, in fact, implemented at the county jail. We therefore believe that the commission was justified in ruling this point against Heitzler.

The fifth charge against Heitzler was that he had repeatedly balked at implementing policies requested by Hennessey in the areas of employment hours, lunch periods and vacations for the ACI personnel. In a memorandum of October 21, 1974, Hennessey informed Heitzler that normal work hours for non-shift county personnel were 8 a. m. to 5 p. m. with one hour off for lunch, and noted that the schedules of a number of the ACI employees were not in compliance with that policy. Hennessey indicated that no exceptions were to be made to the policy without his approval. By return memorandum, Heitzler defended the half-hour lunch period in effect at the ACI on the ground that, because of the remoteness of its location, there was little to do at the ACI in a full one-hour period; he recommended that the current schedule, featuring a number of staggered starting hours for ACI personnel, be retained. Hennessey thereafter took no action in the matter until September 29, 1975, when he again directed that Heitzler institute the full one-hour lunch period. Some weeks later, Heitzler apparently complied.

On the basis of this evidence the commission found that although Heitzler's compliance with Hennessey's directive in the matter was eventually forthcoming, "the entire situation was illustrative of the difficulty Hennessey encountered in obtaining compliance with a directive which he had authority to promulgate." The circuit court, in its contrary finding on this point, stated that there was a total lack of evidence as to what policy, if any, Hennessey had established with respect to lunch periods for the ACI personnel. We believe this finding is clearly refuted by Hennessey's original memorandum of October 21, 1974. We therefore find the commission's ruling in the matter to be supported by competent and substantial evidence.

In the matter of vacation scheduling, the record indicates that on June 18, 1975, Hennessey pointed out to Heitzler that the latter had accumulated 186.61 hours of vacation time and requested that he take at least a three-week vacation within the next sixty days. The memorandum went on to note that a number of other employees at the ACI had accumulated more than 120 hours of vacation time and requested that Heitzler schedule full three-week vacations for such persons. Though the responsibility of scheduling employee vacation periods was Hennessey's, he stated in the memorandum that he was willing to delegate the responsibility to his unit superintendents or division heads with the proviso that all vacations were to be taken as full periods unless the employee requested and received Hennessey's authorization to take partial

vacations. Subsequent correspondence between the two indicates that Hennessey approved a 48-hour (six day) vacation for Heitzler provided the latter would "firmly schedule a full three-week vacation within a reasonable period of time"; that Heitzler failed to schedule such a vacation for himself; and that he failed, despite Hennessey's explicit request, to schedule full vacation periods for those of his subordinates who had accumulated more than 120 hours. The circuit court found in this regard that the general "tenor of these communications was to the effect that vacations would be scheduled as mutually convenient to the employees and the best operational requirements of the institution." Though this is true to some extent, we believe that Hennessey's repeated emphasis on scheduling full vacations makes it clear that that policy was a consideration of high priority for him. Heitzler apparently made no effort to comply with that policy, either in his own case or that of his subordinates. We therefore find the commission's findings on this charge to be supported by the evidence.

The final charge against Heitzler concerned the training of the ACI supervisor of social services, a position directly subordinate to that of the superintendent, Heitzler. In January 1974, while Heitzler was on vacation, Hennessey hired Mr. Peter Manion as the supervisor of social services, with the intention that Manion be trained not only to serve in that capacity, but to assume temporary management of the ACI in the superintendent's absence. Manion testified that from that time until July 1974, when he assumed other duties, he received no training from Heitzler in the area of management of the institution, a contention disputed by Heitzler at the hearing. Manion testified that he was in essence ignored by Heitzler for at least the first month he was on the job at the ACI. When he sought the reason for this treatment from Heitzler, Heitzler informed him that he had received no official notification that Manion was in fact supervisor of social services at the ACI. However, in a May 14, 1974, memorandum from Hennessey to Heitzler, in which Hennessey expressed his displeasure at the treatment Manion was receiving at the ACI, Hennessey indicated that on January 16 he had discussed the Manion appointment with Heitzler and had informed him that Manion was also to be trained to manage the institution. Heitzler denied any recollection of discussing such training for Manion at that time. Manion testified that even after the May 14 memorandum, he received no management training from Heitzler. Manion was subsequently transferred in July and was succeeded in the position by Mr. Ralph Larsen. Larsen testified that he did receive management training from Heitzler. However, neither he nor Manion was put in charge of the ACI during Heitzler's occasional absences in the course of their successive tenures as supervisors of social services at the ACI.

Heitzler has advanced a variety of reasons for his treatment of Manion and Larsen, such reasons relating essentially to his views on the capability and/or attitude of the two. However, we believe that there was adduced competent and substantial evidence from which the commission could have found that Hennessey hired Manion and Larsen through the normal channels; that he had the authority to do so without the direct consultation or approval of Heitzler; that he had the authority to determine that the supervisor of social services was to manage the ACI in the superintendent's absence; that Heitzler was aware of Hennessey's decisions in this regard; but that he failed to delegate to the successive supervisors the authority which Hennessey had requested.

█ Reviewing the evidence in accordance with the standards enunciated supra, *Friedman v. Miller, Hanebrink v. Parker,* we find substantial evidence to support the commission's findings. While we recognize that some exchange of opposing views is inevitable, and even desirable in the normal superior-subordinate relationship, we believe it clear that the commission could find that Heitzler's conduct on numerous occasions went beyond that which was appropriate, that he continued to oppose Hennessey even after letting him know that he disa-

greed with certain of his policies. The record reflects, as charged, a pattern of resistance to those directives with which Heitzler disagreed, resistance which Hennessey overcame, if at all, only by expending an undue amount of effort. We note that the record also reflects the fact that Heitzler was a very capable and respected administrator, sincerely dedicated to the efficient operation of the ACI. It appears that the circuit court was influenced by the considerable testimony to that effect and to the effect that Hennessey's leadership had resulted in low morale in the department, and erroneously substituted its judgment for that of the commission. However, the relative capabilities of Hennessey and Heitzler were not at issue before the reviewing court, nor was the wisdom of Hennessey's policy decisions.

Accordingly, the judgment is reversed and remanded with directions to remand to the Civil Service Commission for disposition in accordance with its order.

KELLY and STEWART, JJ., concur.